EXHIBIT B

## COMMONWEALTH OF MASSACHUSETTS
## SUFFOLK COUNTY SUPERIOR COURT

| | |
|---|---|
| M.M.,<br><br>      Plaintiff,<br><br>      v.<br><br>VGW U.S., INC., VGW HOLDINGS U.S., INC., and VGW LUCKYLAND, INC.<br><br>      Defendant. | **Case No.** 2584 CV U0050<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

*SUFFOLK SUPERIOR COURT, CIVIL CLERK'S OFFICE*
*2025 JAN -8 P 12: 30*
*JOHN A. POWERS III*
*CLERK MAGISTRATE*

## TABLE OF CONTENTS

NATURE OF THE ACTION AND FACTUAL ALLEGATIONS ................................................1

    A.    The Problem Of Online Gambling..........................................................................1

    B.    Defendants Operate Gambling Websites ................................................................4

    C.    Defendants Have Scaled Up, On A Massive Scale, An Illegal Tactic That Criminals Once Tried To Use To Evade State Gambling Laws ..............................8

        1.    The Internet Café Gambling Scam .............................................................8

        2.    Defendants Have Admitted That Their Websites Are Based On The Internet Café Model .......................................................................11

        3.    Alternatively, Defendants' Admissions That Their Websites Offer "Sweepstakes" Is An Independent Reason Why The Websites Are Illegal ......................................................................................16

    D.    All Purported Contracts With Defendants Are Void ............................................18

PARTIES ........................................................................................................................20

JURISDICTION AND VENUE ......................................................................................22

CLASS ALLEGATIONS ...............................................................................................23

FIRST CAUSE OF ACTION: MASS. GEN. LAW C. 93A .........................................24

SECOND CAUSE OF ACTION: MASS. GEN. LAW C. 137 .....................................27

THIRD CAUSE OF ACTION: UNJUST ENRICHMENT............................................28

PRAYER FOR RELIEF .................................................................................................29

## NATURE OF THE ACTION AND FACTUAL ALLEGATIONS

1.      Plaintiff brings this action under Massachusetts General Laws, Chapters 93A and 137, and for unjust enrichment in the alternative, seeking recovery of Defendants' unlawful gambling winnings and injunctive relief to shut down their illegal gambling websites, ChumbaCasino.com and Luckylandslots.com.  These websites offer "real-money" gambling based on an illegal Internet café sweepstakes model.  Defendants also deprive the state of Massachusetts of licensing revenues paid by regulated casinos that, unlike Defendants, play by the rules and operate in this state lawfully.

### A.      The Problem Of Online Gambling

2.      The online gambling industry is profiting from gambling addiction the same way the Sackler family once profited from opioids.  For decades, the proportion of Americans diagnosed with pathological gambling held steady at less than 1 percent, with 7 million Americans believed to be suffering from a gambling addiction at an annual "social cost" of $14 billion.  But those numbers have skyrocketed with the advent of online gambling: from 2021 to 2022, there was a 45 percent increase in the number of calls, texts, and messages to the National Problem Gambling Helpline.

3.      According to one study, up to 30 percent of problem gamblers have attempted suicide, while a larger percentage of such individuals reported having suicidal ideations.

4.      The fallout is not limited to gamblers.  It has a ripple effect that negatively impacts spouses, partners, children, and employers.

5.      During the last five years, online gambling websites have proliferated with no way to reduce the ensuing harm.  This shift is already evident with the gamblers who seek treatment, who tend to be younger, predominantly male, and raised on smart phones.

6.    Treating online gambling addiction poses challenges that are different from other forms of addiction. For an individual with substance use disorder, safety measures like disposing of all alcohol or drug paraphernalia or avoiding triggering social events are key to treatment. Things are not so clear-cut when treating digital gambling because for most people, mobile devices have become a necessity of life. So, it's not a question of avoiding the drive to the casino, but instead, a constant struggle to avoid the temptation to gamble from home, work, restaurants, the grocery store, while on vacation, and anywhere else where the gambler's device can receive a signal. Furthermore, unlike the billions of dollars of federal funding dedicated to alcohol, tobacco and drug addiction programs, there are no federal funds allocated to support problem gambling services.

7.    To make matters worse, although the casino gaming industry is one of the most regulated businesses in the United States, online gaming websites like ChumbaCasino.com and LuckylandSlots.com are unlicensed and unregulated. A gaming license is a privilege that requires, among other things: (1) meeting state standards; (2) background checks on company officers and directors; (3) adherence to responsible gaming programs; (4) anti-money laundering measures; and (5) myriad other requirements concerning data privacy, security, and responding to customer complaints. Defendant dodges all of these requirements. As one gambling treatment provider warned, "[u]nregulated platforms like Chumba Casino can pose significant risks for players struggling with gambling addiction. The lack of proper safeguards often exacerbates financial and emotional stress, making it harder for individuals to regain control."

8.    Defendants also deprive state and local governments of tax revenues that legitimate, regulated casinos pay.

2

9.      The bottom line is that Defendants' websites let people play online casino games and wager real money while skirting regulation and licensing, offering inadequate player protections, and siphoning revenue from state governments.

10.      It should come as no surprise, therefore, that Defendants have faced legal challenges in several states. Regulators in Idaho, Washington, Montana, Michigan, Delaware, and Connecticut have all acted against Defendants and their related entities for unlicensed gambling activities.

11.      For example, the Connecticut Department of Consumer Protection issued a cease-and-desist letter earlier this year, accusing Defendants and their related entities of violating state gambling laws. *See* Exhibit 1. In response, Defendants discontinued operation in the state. Similarly, the Michigan Gaming Control Board banned ChumbaCasino.com in the state. *See* Exhibit 2. More recently, in Delaware—where both Defendants are incorporated—the Department of Safety & Homeland Security, Division of Gaming Enforcement, issued a cease-and-desist letter to Defendants demanding that they take immediate action to ensure that people located in Delaware are not permitted to gamble on the website. *See* Exhibit 3.

12.      Against this backdrop, it is a breathtaking display of chutzpah and lawlessness for Defendants to operate in Massachusetts, where gambling is strictly regulated to minimize the social costs of gambling. In Massachusetts, it is illegal to operate and offer online gambling casinos, including websites that offer slot machines, blackjack, and poker, and websites that use fake "sweepstakes" as a pretext for gambling. *See* 940 Massachusetts Code of Regulations, chapter 30 *et seq.*; Mass. Gen. Laws Ann. ch. 271, § 5B.

13.      Likewise, gambling contracts are void as a matter of public policy. Parties cannot lawfully agree to engage in gambling any more than they can lawfully agree by contract to

engage in child labor, the sale of controlled substances like cocaine, or participate in a murder-for-hire scheme.  In this regard, Massachusetts has a fundamental public policy against unlicensed and unregulated gambling.

### B.    Defendants Operate Gambling Websites

14.    The very name of the websites "Chumba Casino" and "Luckyland Slots" is a clear reference to the purpose of the website: gambling.

15.    As soon as users log onto the websites, the first thing they see is an array of colorful, digital slot machines, along with information about the user's gambling balance near the top of the screen:[1]



---

[1] The images shown in this Complaint are from ChumbaCasino.com.  The LuckylandSlots.com website is the same in all material respects, with the differences primarily being branding, color themes, and the names of individual slot machines.

16.    Just like one would see on the floor of a brick-and-mortar casino in Las Vegas, the digital slot machines come in a wide variety of styles and themes, such as the examples shown below:





17.     All of the slot machines operate in essentially the same manner.  The primary difference between one slot machine and the next has to do with the imagery and theme of the game; other than that, each slot machine is the same in all material respects inasmuch as they all involve gambling.

18.     Another part of the website is dedicated to "Table Games," like poker, blackjack, and other games typically seen on a casino floor:



19.    Once any of these Table Games are accessed, the website digitally replicates a casino table game, much like it would appear in a brick-and-mortar casino.

20.    When playing blackjack, for example, the user first bets from a pile of chips with a value that corresponds to the user's account, hits the "Play" Button to reveal the first cards, and then choses whether to "double," "stand," or "hit":





21.     One of the most insidious aspects of Defendants' websites is that despite the clear purpose of the websites, the word "gambling" is never used.  Instead, Defendants gaslight users—including vulnerable populations who struggle with gambling addiction—by using euphemisms like "social gaming" and "sweepstakes."  Unlike any legitimate "sweepstakes," however, it is common for individual users to lose thousands of dollars gambling on the website.  Indeed, at the bottom of the ChumbaCasino.com website there is a miniscule hyperlink that few are likely to see titled "Responsible Social Gameplay."  Clicking on that tiny link leads to warnings of the "potential risk that can be associated with online gameplay [i.e., gambling] if you don't remain in control."

**C.    Defendants Have Scaled Up, On A Massive Scale, An Illegal Tactic That Criminals Once Tried To Use To Evade State Gambling Laws**

**1.    The Internet Café Gambling Scam**

22.     In the early 2000's, criminals attempted to evade gambling laws by offering gambling at Internet cafés.  These operations—often located in suburban strip malls—would "promote" the sale of a product such as Internet time or long-distance telephone minutes by offering "free" sweepstakes entries to customers.  When customers purchased Internet time or whatever other product was offered, they received a corresponding number of sweepstakes points for each dollar spent.  Customers could then use those sweepstakes points to play "casino-style" slot machine games for cash prizes at computer terminals provided at the Internet cafés.

23.     Many states' gambling and/or sweepstakes laws require three elements: prize, chance, and consideration (i.e., payment).  By artificially separating the consideration from the chance to win real money, operators of Internet cafés believed that they could evade state gambling laws, while claiming that the activities were no different from the kinds of sweepstakes promotions occasionally offered by Publisher's Clearing House and McDonalds.

24.     Courts and state law enforcement officials in the United States, including in Massachusetts, repeatedly determined that such tactics were an obvious pretext and cover for illegal gambling.  In fact, such Internet cafés are illegal in Massachusetts under 940 Mass. Code Regs. 30.04, which governs illegal "Lotteries, Sweepstakes and de Facto Gambling Establishments," and makes operation of Internet cafés a violation of  M.G.L. c. 93A, § 2(a).  Likewise, Mass. Gen. Laws Ann. ch. 271, § 5B, makes it unlawful to "conduct" or "promote a sweepstakes that is conducted through the use of an entertaining display," which is precisely what Internet cafés and Defendants' websites do.

25.     For example, in 2011, three individuals—including a Fall River, Massachusetts City Counsil member—were indicted and charged with various gaming charges in connection with the operation of two Internet cafés.  The defendants unsuccessfully argued that players were only paying for Internet time and that any gambling that occurred involved legitimate sweepstakes offers.  The Massachusetts Attorney General stated unequivocally that this conduct constituted illegal gambling.

26.     More recently, an individual in Mississippi was convicted of racketeering and gambling charges in connection with an Internet café where—like here—customers could play simulated games that resembled gambling programs, such as slot machines, keno, and poker.  Customers needed a "sweepstakes" code to play the game, but customers could not purchase a sweepstakes code outright.  Instead, customers received sweepstakes codes by purchasing something else in the store, such as food or phone minutes.

27.     In 2015, the California Supreme Court addressed Internet café gambling in *People ex rel. Green v. Grewal*, 61 Cal. 4th 544 (2015), where the defendant sold Internet time on computer terminals.  The defendant promoted the sale of Internet time and other products with a

9

"sweepstakes" giveaway, wherein the defendant provided 100 "sweepstakes points" for each dollar spent, which could then be used to play games of chance. The defendants denied that the operation involved gambling because they were supposedly only selling computer time, and that the sweepstakes games were "not gambling" but instead a "promotional game." The Kern County District Attorney obtained a civil injunction for violations of California's gambling laws, and that injunction was affirmed on appeal.

28.    In *Lucky Bob's Internet Café, LLC v. California Dept. of Justice*, 2013 WL 1849270 (S.D. Cal. 2013), the Bureau of Gambling Control, a bureau within the Department of Justice's Division of Law Enforcement, seized property owned by an Internet café where customers were given 100 entries to a Sweepstakes for every $1 of purchased Internet time, which could then be used to play one of seventeen casino-style games. The Internet café owner sued for declaratory relief, seeking a declaration that the operation did not violate California's gambling laws because, among other reasons, it was missing the element of consideration. The district court rejected that argument, granting summary judgment in favor of the California Department of Justice.

29.    In *Telesweeps of Butler Valley, Inc. v. Kelly*, 2012 WL 4839010 (M.D. Pa. Oct. 10, 2012), a Pennsylvania federal court held that the purchase of a long-distance telephone card that came with a commensurate number of free entries to participate in a 'casino-style' sweepstakes game constituted "indirect consideration" to participate in the sweepstakes, even though no purchase was necessary and (like here) alternative methods of free entry were available. In rejecting the defendant's argument that the customer was simply paying for telephone time and not the sweepstakes entries, the court declared that "plaintiff's attempt to separate the consideration from the chance to win by inserting a step between the two elements is

clever, but it merely elevates form over substance. At bottom, what Telesweeps is doing constitutes gambling."

30.    In rejecting a similar sweepstakes scheme in *City of Cleveland v. Thorne*, 987 N.E.2d 731 (2013), the Ohio Court of Appeals explained, "the justice system is not some lumbering oaf who must ignore the patently obvious gambling scheme apparent here simply because of a contrived separation between consideration and the scheme of chance." The court added, "there is no justification for ignoring the nature of the transaction simply because the system is designed in such a way as to artificially isolate one part of the illegal transaction from another. The justice system is not so blinded by chicanery."

31.    As the South Carolina Attorney General put it, "a gambling scheme cannot be transformed into legitimacy merely by splitting it into to parts. … To try and conceal gambling behind the façade of the purchase of Internet time is … nothing more than legal trickery."

### 2.    Defendants Have Admitted That Their Websites Are Based On The Internet Café Model

32.    Although Defendants will deny in this litigation that their websites involve gambling, that is not what they said before when seeking investors. In January 4, 2016 prospectus, a related company VGW Gaming Limited admitted that the business model in ChumbaCasino.com **is modelled on the illegal Internet cafés that were popular in the early 2000's:**

67  Over the last 10 years, 'Internet Sweepstakes Cafes' have evolved and proliferated across the US. They operate as internet cafes that offer their customers entrance into a sweepstakes draw upon the purchase of a product, often internet time or telephone call minutes. The participant can find out whether they have won the pre-determined draw by a simple reveal but many choose to do so through a programme that simulates a slot machine or poker game. This may even include an online element, but neither the presentation nor their interaction affects the outcome of the draw.

68  Increasingly sweepstakes gaming has emerged out of these cafes, with consumer products allowing 'free' entrance into games in which cash prizes can be won in return.

Exhibit 4, at p. 95.[2]  The prospectus also explains how, at the time, "**Internet Sweepstakes Cafes** are reported to have turned over **$10bn (€9.4bn)** in 2015, with **over 5,000** now operating in **12 states**" (*id.* at 69 (emphasis added)), and described the "significant opportunity" of adopting the "sweepstakes café model." *Id.* at 95-96.

33.    The prospectus was prepared by H2 Gambling Capital, which is described as "the leading authority regarding market intelligence on the global gambling industry." *Id.* at 68.  The prospectus refers to "gambling" 79 times, and noted that "**despite significant prohibition**, [the U.S.] remains by far the largest gaming market in the world." *Id.* at 69 (emphasis added).

34.    Likewise, in an October 2015 press release in Australia, a related entity called VGW Holdings Limited stated that its gambling websites are "targeting the global casino market, particularly the unrealised [sic] United States **real-money gaming market**."

- VGW is an Australian technology and online gaming company that develops and operates international cash-prize contests through its innovative social casino products. It currently operates on the largest social network and leverages the world's leading payment provider platforms.
- VGW operates a sweepstakes social casino, targeting the global casino market, particularly the unrealised United States real-money gaming market.

Exhibit 5, at p. 1.

35.    When denying that their websites offer gambling, Defendants have consistently deployed the same arguments that operators of Internet cafés unsuccessfully deployed in cases in Massachusetts and across the United States.

---

[2] The complaint includes only excerpts of the Prospectus due to its voluminous size.

36.     Like the criminal Internet cafés in operation a decade ago, Defendants here attempt to separate the element of consideration from gambling by offering a two-tiered system of virtual coins, both of which function like casino chips.

37.     The first type of virtual currency –called "Gold Coins" – can be used to play the casino games in "standard mode" with no potential for redeeming any prizes.  When gambling in "standard mode" with Gold Coins, a player can only win or lose Gold Coins, which can be used to place wagers on the various games.   The second type of virtual currency –called "Sweeps Coins" – can be used to play the same casino-style games in a "promotional sweepstakes mode," where they carry real monetary value and can be redeemed for prizes and money.

38.     When a player first starts up an account on the website, they are given a free initial allotment of virtual Gold Coins, and a small number of virtual Sweeps Coins.  These coins are required for gameplay.   The chance for a player to win more coins or lose their bet is a fixed random chance and not skill-based.  All games require a "minimum bet" of coins before a player can play.  If a player runs out of coins or has less than the amount required for a minimum bet, they cannot play the game until they replenish their supply.

39.     Players can buy different packages of virtual Gold Coins for real currency, ranging from $1 for 200,000 Gold Coins to $200 for 120,000,000 Gold Coins.

40.     When a person purchases Gold Coins, they also receive Sweeps Coins, which is by far, the most common way for users to obtain Sweeps Coins.  The more Gold Coins a user purchases, the more Sweeps Coins the user also receives.  So, in effect, when a person buys Gold Coins, they are also buying Sweeps Coins as part of a package.

41.     Moreover, the number of Sweeps Coins is essentially a proxy for the amount of real money spent or won.  That is because the standard coin bundles involve a nearly 1:1

13

correlation between the number of dollars spent and the number of Sweeps Coins provided in each purchase. So, for example, if someone spends $100 dollars ostensibly to by Gold Coins on Chumba Casino, they get 104 Sweeps Coins. If someone spends $100 dollars ostensibly to by Gold Coins on Luckyland Slots, they get 101 Sweeps Coins.

42.    Likewise, Sweeps Coins are redeemable on a 1:1 basis. So, for example, 100 Sweeps Coins can be redeemed for $100.

43.    Defendants claim that no purchase is necessary to buy Sweeps Coins and that they are just a "bonus" added to the purchase of Gold Coins, but the reality is that generally, both coins must be purchased, and Defendant will only sell them together as a package. As noted above, claiming that sweepstakes tokens are just a free bonus is an old tactic that criminal operators of Internet cafés unsuccessfully used to evade gambling laws.

44.    Players can use real currency to purchase additional virtual Gold Coins and Sweeps Coins through the website. In this way, the purchase of virtual coins is like what happens when a player purchases casino chips in a brick-and-mortar casino, which can then be used to place wagers at table games.

45.    There are several other factors that show that the true purpose of Defendants' websites is gambling, and that like the Internet cafés that preceded the launch of Defendants' website, the use of the term "sweepstakes" is a pretext for gambling.

46.    First, the casino-like atmosphere and imagery associated with the website, as well as the use of the word "casino" in the website name, is evidence that the true purpose of the website is to promote gambling, as opposed to a sweepstakes promotion of some other good or service.

14

47.    Second, the duration of the "sweepstakes" promotion also demonstrates that the true purpose of the website is not to promote a bona fide consumer good or service, but instead gambling. A traditional sweepstakes promotion is a limited term event designed to attract consumer attention to a product or business, and ordinarily expires after a few weeks or months. In contrast, Defendants' purported "sweepstakes," runs perpetually.

48.    Third, the typical payout percentage for a temporary promotional sweepstakes is a small percentage of revenue earned by the company. For example, the typical grand prize for McDonald's annual Monopoly-themed sweepstakes is usually about $1 million, which is a tiny fraction of the *billions* of dollars McDonald's earns each year. By contrast, casinos typically pay out between 80-96 percent of their revenues (sometimes referred to as the "return to player" or "RTP"). Defendants claim to have a 90-96% RTP on its websites.

49.    Fourth, conditions designed to keep customers playing longer are indicative that the true purpose of the website is to keep them gambling, rather than a true sweepstakes aimed at promoting a product or service. Unlike traditional sweepstakes games where prizes can be claimed immediately, Defendants impose restrictions on prize redemption that can cause website visitors to play longer. Specifically, website visitors must have at least 100 Sweeps Coins to redeem. This forces consumers to continue gambling and eventually lose their balance.

50.    Fifth, most if not all users of the websites largely ignore their ample supply of Gold Coins in favor of playing Sweeps Coins, which is a clear indication that the Sweeps Coins, and not the supposedly promoted product (Gold Coins), are the primary subject of the transaction.

51.    In sum, the parallels between Defendants' websites and the Internet sweepstakes café business model—which courts have held are incontestably gambling—are clear:

✓ Both sell a "product" that comes with a commensurate number of "free" sweepstakes entries to play real money 'casino-style' games of chance in a 'casino-like' setting. Instead of the cafés selling a "prepaid phone card," Defendants sell virtual Gold Coins.

✓ Both run sweepstakes games perpetually and not on a limited and occasional basis, as is typical with legitimate promotional sweepstakes like the McDonald's monopoly sweepstakes.

✓ Both offer casino-like payouts, typically 90% or more of revenues, whereas legitimate promotional sweepstakes normally have very low prize to entrant ratios.

✓ Both offer several ways to get free entries without requiring a product purchase, such as by mailing a postcard to a designated P.O. Box address, although the number of free entries awarded through this method is a very low amount, if anything at all.

### 3. Alternatively, Defendants' Admissions That Their Websites Offers "Sweepstakes" Is An Independent Reason Why The Websites Are Illegal

52.    Even if Defendants' operation fell outside the legal definition of gambling, their admission that the websites offer "sweepstakes" furnishes a second and independent reason that the websites are unlawful.

53.    940 Massachusetts Code of Regulations, chapter 30 *et seq.*, governs "Unlawful, Lotteries, Sweepstakes and de Facto Gambling Establishments." Chapter 30.04 provides as follows:

> (1) It is an unfair and deceptive act or practice in violation of M.G.L. c. 93A, § 2(a) for a person to solicit or accept payment for a chance to win a prize.
> (2) With respect to a business or a transaction that involves or purports to involve both a chance to win a prize and the sale or purported sale of a good or service, it is an unfair and deceptive act or practice in violation of M.G.L. c. 93A, § 2(a) for any person to engage in a business or engage in a transaction where a gambling purpose predominates over the *bona fide* sale of *bona fide* goods or services.

16

54. This provision applies to any business or entity, "physical or otherwise," and thus includes online businesses. *See id.* at Ch. 30.03 (defining "Establishment").

55. The term "sweepstakes" includes any game or promotion where a person may become eligible to receive a prize, "with or *without* consideration." *Id.* (defining "Sweepstakes") (emphasis added). So, any argument by Defendants that no purchase is necessary to participate in the sweepstakes is irrelevant.

56. As explained by the Massachusetts Supreme Court, the Massachusetts Attorney General has engaged in a well-publicized effort to "curb the proliferation—and secure the regulation—of online gambling …." *New England Internet Café, LLC v. Clerk of Superior Court for Criminal Business in Suffolk Cnty.*, 462 Mass. 76, 79 (2012). In response to arguments that "such gaming involves legitimate sweepstakes offers, the Attorney General has stated her unequivocal position that it constitutes illegal gambling." *Id.*

57. Defendants "solicit or accept payment for a chance to win a prize" when they sell Gold Coins, because such purchases always include Sweeps Coins, which Defendants state can be redeemed for "prizes."

58. Given that Defendants repeatedly describe its websites as offering "casino-style" gaming, and does not offer much if anything else, the "gambling purpose" of the website necessarily "predominates" over any purported non-gambling offerings.

59. Defendants' purported sweepstakes is further illegal under Mass. Gen. Laws Ann. ch. 271, § 5B, which provides in relevant part as follows:

> It shall be unlawful for any person to knowingly possess with the intent to operate, or place into operation, an electronic machine or device to: (1) conduct a sweepstakes through the use of an entertaining display, including the entry process or the reveal of a prize; or (2) promote a sweepstakes that is conducted through the use of an entertaining display, including the entry process or the reveal of a prize.

60.    "Any person who violates this section shall be punished by a fine of not more than $250,000 per electronic machine or device placed into operation or by imprisonment in state prison for not more than 15 years, or by both such fine and imprisonment." *Id.* at § 5B(d).

61.    This statute is consistent with 940 Mass. Code Regs. 30.04, inasmuch as the term "sweepstakes" includes any game in "which, *with or without* payment of any consideration, a person may enter to win or become eligible to receive any prize, the determination of which is based on chance." Mass. Gen. Laws Ann. ch. 271, § 5B(a).

62.    The statute also applies to online gaming that simulates casino gambling, because the term "entertaining display" means any "visual information" that "takes the form of actual game play or simulated game play," and the definition of "electronic machine or device" includes screen and "server based" technology that "utilize[s] software" and "computer game[s]." *Id.*

**D.    All Purported Contracts With Defendants Are Void**

63.    Plaintiff has no contract with Defendants and neither are identified in the websites' Terms and Conditions as third party beneficiaries. Courts do not have the power to create for the parties a contract that they did not make and cannot insert language that one party now wishes were there. Any ambiguities on this issue are construed against Defendants.

64.    Even if Defendants were a party to the Terms and Conditions, they are void and unenforceable. First, "[i]t is well-established that contracts for illegal purposes are void as a matter of public policy." *United States v. Mardirosian*, 602 F.3d 1, 7 (1st Cir. 2010) (applying Massachusetts law). "When a contract is *void ab initio*, the contract 'may not be enforced,' and the court will treat the contract 'as if it had never been made.'" *Id.* (quoting *Mass. Wholesale Elec. Co. v. Town of Danvers,* 411 Mass. 39, 577 N.E.2d 283, 292–93 (1991)).

65.     Over one hundred years of case law establishes this rule applies to gambling contracts in Massachusetts. *See Savoy Fin. Co. v. De Biase*, 281 Mass. 425, 432 (1933) (collecting authorities holding that "a wagering contract [is] illegal and void"). The Massachusetts Supreme Court addressed the issue directly in *Harvey v. Merrill*, 150 Mass. 1, 11 (1889), which held that "wagering contracts" are "void" by common law "because they are against public policy."

66.     Parties cannot lawfully agree to engage in gambling any more than they can lawfully agree by contract to engage in child labor, illicit drug sales, sex trafficking, or other crimes.

67.     Second, the choice of law provision in Chumba's Terms and Conditions purports to require application of Delaware law. Although that choice of law provision is unlawful, unconscionable, and unenforceable, even if the Court determined that Delaware law governs, then the contracts are void for the same reason: gambling contracts are illegal and void *ab initio* in Delaware.

68.     The Terms and Conditions also have a venue provision that purports to require that any dispute be submitted exclusively to the courts in Malta. This provision is void for the same reasons alleged above. Also, the provision is an unconscionable and unlawful tactic to deter enforcement of state gambling laws. Defendants in this action have no connection to Malta whatsoever—they are both Delaware corporations with their principal place of business in Colorado.

69.     The Terms & Conditions describe no relationship between Defendants and Malta.

70.     Most of the employees of VGW-related entities are employed in one of two offices in Australia, including employees involved with finance and tax, legal matters, operations, and software engineering.

71.     All the companies' CEOs and executives are in Australia.

72.     After the offices in Australia, the locations with the second and third highest numbers of employees are Krakow, Poland and Manila, Philippines.

73.     Massachusetts has a greater interest in this matter than either Delaware or Malta because Defendants' conduct violates Massachusetts criminal laws, deprives the state of gambling revenues, and causes people in Massachusetts to suffer the social consequences of unregulated gambling.

74.     This lawsuit also involves non-waivable and fundamental public policies affecting people in Massachusetts.

75.     In contrast, Maltese courts have no interest in applying Delaware law (or Massachusetts law) to conduct and harms that occur in Massachusetts, and in a dispute with Defendants who have no direct connection to Malta.

## PARTIES

76.     Plaintiff M.M. is domiciled in Rhode Island but is frequently in Massachusetts and has frequently gambled on the subject websites while in Massachusetts. Plaintiff struggles with gambling addiction and due to the stigma associated with addiction and a desire to not disclose personal mental health information, he is filing this matter anonymously but will disclose his name as necessary to the Court under seal. Plaintiff lost money on Defendants' illegal gambling websites within the last four years. As a result, he suffered an injury in fact resulting in the loss of money and/or property.

77.    Plaintiff has no past or present financial, employment, familial, or other relationship with any of the attorneys in this case that would create a conflict of interest with the proposed class members.

78.    Defendant VGW Holdings U.S. Inc. ("VGW Holdings") is a Delaware corporation with its principal place of business at 1881 9th Street, Suite 2002, Boulder Colorado, 80302.  VGW Holdings also maintains an office at 442 Post Street, Suite 900, San Francisco, CA 94102.

79.    Defendant VGW U.S. Inc. ("VGW U.S.") is a Delaware corporation with its principal place of business at 1881 9th Street, Suite 2002, Boulder Colorado, 80302.  VGW U.S. also maintains an office at 442 Post Street, Suite 900, San Francisco, CA 94102.

80.    Defendant VGW Luckyland, Inc. is a Delaware corporation with its principal place of business at 1881 9th Street, Suite 2002, Boulder Colorado, 80302.  VGW Luckyland Inc. also maintains an office at 442 Post Street, Suite 900, San Francisco, CA 94102.

81.    Defendants have stated in court filings that they "specialize[] in the development and publication of online casino-themed social games," including the gambling websites at issue here, ChumbaCasino.com and LuckylandSlots.com .

82.    Defendants work in conjunction with at least three other related entities—VGW Malta Ltd., VGW Group, and VGW Games—and participate and support operation of the websites in the United States and processing U.S. gambling winnings.  None of the Defendants are authorized in Massachusetts or anywhere else in the United States to offer gambling to the public.

83.    Through the websites, each Defendant conducts business in Massachusetts.

21

## JURISDICTION AND VENUE

84.     This Court has jurisdiction over this matter pursuant to Mass. Gen. Laws ch. 212, §§ 3 and 4 because this is a civil action where the aggregate claims of all members of the proposed class are in excess of $50,000, exclusive of interest and costs.

85.     The Court has personal jurisdiction over Defendants pursuant to Mass. Gen. Laws ch. 223A § 3(a) and (b) because Defendants regularly engages in gambling in Massachusetts.

86.     ChumbaCasino.com and LuckylandSlots.com are interactive websites used for commercial purposes—specifically, gambling.

87.     Both websites are accessible and made available in Massachusetts.

88.     Both websites appeal to, and profits from, an audience in Massachusetts, and Massachusetts residents form a significant portion of the websites' customer base.

89.     It was foreseeable that Massachusetts residents would use the websites because Defendants knew that Massachusetts residents frequently gamble on the websites and that they will continue to do so.  Defendants know that people in Massachusetts use the website because there is widely available technology that allows websites to detect the location of a website visitor based on the website visitor's IP information, including the state in which they are located.  Defendants utilize this technology on the subject websites and blocks users from certain states.  However, Defendant made an affirmative decision not to use that technology to block Massachusetts website visitors because that would prevent Defendant from profiting from gambling in Massachusetts, a significant market in the United States.

90.     The Terms and Conditions of the subject websites purport to prohibit the use of the websites from certain states.  Massachusetts is not one of those prohibited states.

22

91.     Venue is proper in the Business Litigation Session ("BLS"), pursuant to Superior Court Administrative Directive No. 17-1, because this case is complex and is brought as a class action which will require substantial case management.

## CLASS ALLEGATIONS

90.     Plaintiff seeks to represent classes defined as:

> All persons in Massachusetts who gambled on ChumbaCasino.com;

> All persons in Massachusetts who gambled on LuckylandSlots.com.

91.     Subject to additional information obtained through further investigation and discovery, the foregoing class definitions may be modified by amendment or in the motion for class certification, including through the use of subclasses.

92.     Class members are so numerous that their individual joinder herein is impracticable.  On information and belief, the number of class members is in the tens of thousands, if not more.  The precise number of class members and their identities are unknown to Plaintiff at this time but may be determined through discovery.

93.     Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to:

    (a)    whether Defendants' websites offer unlawful gambling;

    (b)    whether Defendants' websites offer unlawful sweepstakes;

    (c)    whether Defendants' have been unjustly enriched by the operation of their websites;

    (d)    whether Plaintiff and Class members were injured by Defendants' conduct;

    (e)    whether Plaintiff and the other members of the Class are entitled to an injunction shutting down operation of the websites.

94.     The claims of the named Plaintiff are typical of the claims of the class members because they all arise from the unlawful gambling made available on Defendants' websites.

95.     Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of class members he seeks to represent.  Plaintiff has retained competent counsel experienced in prosecuting class actions, and he intends to prosecute this action vigorously.

96.     The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of class members.  Each individual class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendants' liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendants' liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

## FIRST CAUSE OF ACTION
### Massachusetts General Laws Chapter 93A, § 2

97.     Plaintiff repeats and re-allege all previous paragraphs, as if fully included herein.

98.     Plaintiff brings this claim on behalf of himself and all class members

99.     Massachusetts law prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. Laws Ch. 93a, § 2.

24

100.    Plaintiff, class members, and Defendants are "persons" within the meaning of Mass. Gen. Laws Ch. 93a, § 1(a).

101.    Defendant is engaged in "trade" or "commerce," within the meaning of Mass. Gen. Laws Ch. 93A, § 2.

102.    Defendants are not incorporated or headquartered in Massachusetts.  Defendants have no property in Massachusetts.

103.    Defendant engaged in one or more of the following unfair or deceptive acts or practices as prohibited by Mass. Gen. Laws Ch. 93A, § 2:

   a.  By operating their websites, Defendants violate 940 Massachusetts Code of Regulations, chapter 30.04's prohibition against "Unlawful, Lotteries, Sweepstakes and de Facto Gambling Establishments."

   b.  By operating their websites, Defendants violate Mass. Gen. Laws Ann. ch. 271, § 5B.

   c.  By operating unlawful, online gambling establishments without the requisite licensing and approval from the Massachusetts Gaming Commission,

   d.  By advertising their websites in a manner that has the tendency or capacity to deceive or confuse users into believing that the activities on the websites are lawful, when in fact they are not.

104.    Massachusetts aggressively regulates all forms of gambling.  One reason it does so is to prevent consumers from being cheated by professional gambling operations, to minimize the social harm of gambling, and to generate state revenue.

105.    Because Defendants' websites operate as if they are not subject to gambling regulations, the websites do not comply with all the regulations that govern gambling operations.

106.    The utility of the Defendants' conduct is outweighed by the gravity of harm to the public, because the social costs of gambling are well known and adversely affect the public interest.  Defendants' operation of their websites offends an established public policy that gambling is generally illegal, with narrow and specific exceptions for certain regulated gambling operations.  Defendants' operation also unfairly makes money from consumers by evading the strict regulation and control of Massachusetts' gambling statutes.

107.    Operating an unlicensed and unregulated gambling operation—or attempting to exploit perceived loopholes in gambling laws—is immoral, unethical, oppressive, unscrupulous and/or substantially injurious to consumers.

108.    The social cost of gambling is substantial, and the injury caused to consumers is not outweighed by any countervailing benefits to consumers or competition.  The conduct at issue here provides no benefits to consumers or competition.  Defendants avoid Massachusetts' extensive gambling regulations that reputable and licensed gambling operations must comply with, and withhold state revenues from gambling that Defendants' regulated competitors must pay.  The injury is not one that consumers can reasonably avoid, especially if a person, a person's spouse, or a person's dependent struggles with gambling addiction.

109.    Defendants' conduct at issue here is also tethered to underlying statutes and regulations prohibiting unlicensed and unregulated gambling, and violates the policy or spirit of antitrust law.

110.    Defendants' conduct also is unfair to the extent that Defendants exploit perceived loopholes in gambling laws that Defendants believe allow them to portray its gambling operation as a "sweepstakes" while in fact offering conventional—and highly regulated—gambling games like slots and poker.

111.    Defendants' conduct also constitutes an unfair business practice because Defendants target and exploit vulnerable and addicted players while falsely denying that their websites involve gambling.

112.    Plaintiff and class members have suffered injury in fact, including economic injury, and actual damages resulting from Defendants' operation of illegal gambling websites.

113.    Plaintiff seeks all available relief under this cause of action, including injunctive relief to shut down operation of the website and statutory damages.

## SECOND CAUSE OF ACTION
### Massachusetts General Laws Chapter 137, § 1

114.    Plaintiff incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

115.    The Plaintiff brings this claim on behalf of himself and all class members.

116.    The games of chance offered on Defendants' websites are "cards, dice or other game[s]" within the meaning of the statute.

117.    Defendants' websites are not "licensed gaming establishments pursuant to chapter 23k or sports wagering conducted pursuant to chapter 23N" and therefore do not fall within the statutory exclusions under chapter 137.

118.    Plaintiff and class members have lost money to Defendants while playing games of chance on Defendants' websites.

119.    Plaintiff and class members have paid or delivered money or other things of value to Defendants for or in consideration of a chance of obtaining money, prizes, or things of value.

120.    Plaintiff seeks on behalf of himself and all other class members, all relief available under this statute, including treble damages.

## THIRD CAUSE OF ACTION
### Unjust Enrichment

121.    Plaintiff incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

122.    The Plaintiff brings this claim on behalf of himself and all class members.

123.    To the extent required by law, this cause of action is alleged in the alternative to legal claims.

124.    Plaintiff and class members conferred a benefit on Defendants in the form of the gross revenues Defendants derived from their role in the operation of the websites.

125.    Defendants have been unjustly enriched in retaining the unlawful gambling revenues derived from Plaintiff's and the class members.  Retention of such revenues under these circumstances is unjust and inequitable because (1) Defendants falsely imply to website users that its websites do not involve illegal gambling; (2) Defendants profit from and exploit individuals who struggle with gambling addiction; and (3) Defendants' business model depends on exploiting perceived loopholes in state gambling law.

126.    Defendants benefit financially from the unlawful websites and retain financial benefits from consumers who loose money on those websites.  Defendants are not "innocent third parties," but instead are key players in the operation and promotion of the websites.

127.    There is a direct relationship between the detriment experienced by Plaintiff and class members and the benefits that Defendants obtain as a result their roles in operating the websites.  The detriment to class members and Defendants' benefits all flow from the challenged conduct at issue here: namely, the operation of unlawful gambling websites.

128.    Defendants' conduct in operating and marketing the websites was a proximate cause of Plaintiff's and class members' injuries.

129.    Plaintiff and class members lack an adequate remedy at law with respect to this

claim and are entitled to non-restitutionary disgorgement of the financial profits that Defendants

obtained as a result of their unjust conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the putative class members, pray:

A.    For public injunctive relief shutting down the operation of Defendants' unlawful

gambling websites, ChumbaCasino.com and LuckylandSlots.com.

B.    Recovery of actual and statutory damages, including treble damages.

C.    Recovery of non-restitutionary disgorgement of profits.

D.    An award of fees and costs, to the extent permissible by law.

E.    For such other and further relief as the Court may deem proper.

Dated: January 7, 2025          **SMITH KRIVOSHEY, PC**

By: _____
　　　Joel Smith

**SMITH KRIVOSHEY, PC**
Joel D. Smith (BBO 712418)
867 Boylston Street 5th Floor #1520
Boston, MA 02116
Telephone: 617-377-4704
Facsimile: (888) 410-0415
E-Mail: joel@skclassactions.com

**SMITH KRIVOSHEY, PC**
Yeremey O. Krivoshey (pro hac vice forthcoming)
166 Geary Str STE 1500-1507
San Francisco, CA 94108
Telephone: 415-839-7077
Facsimile: (888) 410-0415
E-Mail: yeremey@skclassactions.com

*Attorneys for Plaintiff*

**EXHIBIT 1**



# STATE OF CONNECTICUT
*DEPARTMENT OF CONSUMER PROTECTION*

February 9, 2024

**<u>Via Certified Mail</u>**

VGW US Inc.
442 Post Street, Suite 900
San Francisco, CA 94102

To Whom it May Concern:

The Department of Consumer Protection ("Department") has become aware that VGW Holdings Limited ("VGW"), located at 442 Post Street, Ste 900 is conducting unlicensed online gambling.  VGW's actions are in violation of Connecticut General Statutes (Conn. Gen. Stat.) §§ 53-278b, 53-278d, 42-296, and 42-301, and the Connecticut Unfair Trade Practices Act ("CUTPA"). The Department, therefore, orders VGW to cease and desist advertising and offering its games and services to Connecticut customers.

Conn. Gen. Stat. § 53-278b prohibits gambling and professional gambling. Gambling is defined as "risking any money, credit, deposit or other thing of value for gain contingent in whole or in part upon lot, chance or the operation of a gambling device . . . ." Conn. Gen. Stat. § 53-278a.  Professional Gambling means "accepting or offering to accept, for profit, money, credits, deposits or other things of value risked in gambling . . . ." Id.

Public Act 21-23 authorized online gambling in Connecticut, but only for specific licensed entities. VGW does not possess an online gaming operator's license under Conn. Gen. Stat. § 12-857 or any other relevant qualification that would all VGW to provide online gaming to Connecticut residents; nor do VGW's actions fall within any of the excepted activities to the prohibition on gambling listed in Conn. Gen. Stat. § 53-278g.

VGW's promotion of unlicensed and illegal gambling services is also an unfair trade practice, which violates CUTPA.



# STATE OF CONNECTICUT
## *DEPARTMENT OF CONSUMER PROTECTION*

VGW is hereby ordered to immediately cease and desist offering its games and services to Connecticut Customers. Failure to comply may result in additional action including, but not limited to, civil penalties under CUTPA and/or criminal penalties under Conn. Gen. Stat. §§ 53-278b and 53-278d.

Sincerely,

Maureen Magnan,
Deputy Commissioner

450 Columbus Boulevard. Suite 901, Hartford, Connecticut 06103-1840
General Information (860) 713-6100
Website: ct.gov/dcp
*An Affirmative Action / Equal Opportunity Employer*

**EXHIBIT 2**



# MGCB Michigan Gaming Control Board

# Michigan Gaming Control Board sends cease-and-desist letters to US, international internet gaming companies due to illegal operations

January 18, 2024

**Media Contact:**

## Lisa Keith

Public Information Officer

MGCB-media@michigan.gov

313-456-1344

DETROIT, Jan. 18, 2024 — As part of its continued, relentless efforts to halt illegal gaming operations in the state of Michigan, the Michigan Gaming Control Board (MGCB) recently sent cease-and-desist letters to three online gaming companies — two in the U.S. and one overseas — after investigations revealed the entities are offering online gaming in Michigan without licenses to do so legally.

**PredictionStrike Inc.**, in Bay Shore, New York; **Sweepstakes Limited (Stake.us)**, in Limassol, Cyprus; and **VGW LuckyLand, Inc. (VGW)** in San Francisco, California — whose parent company is VGW Holdings Ltd., a global technology online social gaming company headquartered in Australia — were each sent cease-and-desist letters on Oct. 19, Nov. 2, and Dec. 5, 2023, respectively.

> *"Gambling regulations are in place for a reason, and illegal gambling operations are not welcome in Michigan,"* **MGCB Executive Director Henry Williams** *said. "We do not want businesses who skirt the law having access to Michigan citizens and leaving them vulnerable because they are playing on unregulated sites that leave them with no recourse, and that siphon funds away from communities because they are not paying taxes like a regulated, legal gambling establishment would."*

The companies' violations include:

- Offering internet gaming and internet sports betting in Michigan without being licensed in the state as an internet gaming operator and a sports betting operator (PredictionStrike).

- Promoting an unlicensed online lottery and/or raffle for customers that buy its products through its internet website (Stake.us).

- Conducting illegal gambling by offering an internet game in which a player wagers something of monetary value for the opportunity to win something of monetary value (VGW).

Due to their unregulated and unlicensed online gaming offerings, PredictionStrike, Stake.us, and VGW are in violation of the following Michigan gaming laws, including the:

- Lawful Internet Gaming Act, which states that internet gaming may only be offered by a licensed internet gaming operator, and the Lawful Sports Betting Act, which states that internet sports betting may only be offered by a licensed sports betting operator or its licensed sports betting platform provider. Only casinos that are currently licensed under the Michigan Gaming Control and Revenue Act and federally authorized tribal casinos within Michigan can apply for an internet gaming operator license or a sports betting operator license.

- Michigan Gaming Control and Revenue Act, which prohibits a party from conducting a gambling operation without a license issued by the MGCB. A party who operates an unlicensed gambling operation is guilty of a felony punishable by imprisonment for up to 10 years or a fine of up to $100,000, or both.

- Michigan Penal Code, which broadly prohibits any form of unauthorized gambling involving consideration, prize, and chance. For example, accepting money, or anything of value, with the understanding that money, or anything of value, will be paid to any person based on the outcome of an uncertain event is prohibited.

PredictionStrike Inc., Sweepstakes Limited (Stake.us), and VGW LuckyLand, Inc. (VGW) have each taken steps to prevent Michigan residents from gambling on their websites.

If Michigan residents have information regarding illegal gambling websites, they can report their tips to the MGCB by calling 1-888-314-2682 or sending a message to MIGamblingTip@michigan.gov.

*Gambling in any form is for entertainment purposes only. If someone has a gambling problem, please call the state's 24-hour, toll-free helpline at 1-800-270-7117 or the MGCB's responsible gaming section at 1-888-223-3044. Visit the Responsible Gaming page of the MGCB website for information on self-exclusion programs including the Disassociated Persons List and the Internet Gaming and Sports Betting Responsible Gaming Database, and DontRegretTheBet.org for additional tools to game responsibly.*

*The Michigan Gaming Control Board shall ensure the conduct of fair and honest gaming to protect the interests of the citizens of the state of Michigan. Learn more at Michigan.gov/MGCB.*

MI Newswire        Gaming Control Board        Executive Office        Illegal Gaming

Internet Gaming and Internet Sports Betting        Licensing        Press Release

01 January        2024

# Related News

## Detroit casinos report $108.35M in November revenue

## Michigan Gaming Control Board to meet December 10

## iGaming, sports betting operators report $253.7M in October revenue

## Michigan Gaming Control Board, Department of Attorney General announce guilty pleas in illegal gambling operations case in Flint

Michigan Gaming Control Board to meet November 19

Detroit casinos report $102.9M in October revenue

Michigan Gaming Control Board authorizes BetMGM to enable shared liquidity for multi-state internet poker games

Two defendants plead guilty in Cellular Bank illegal gambling operations case in Flint

iGaming, sports betting operators report $261.0M in September revenue

Michigan Gaming Control Board to meet October 15



Michigan Gaming Control Board sends cease-and-desist letters to US, international internet gaming companies due to illegal operations

Copyright State of Michigan

**EXHIBIT 3**

**State of Delaware**
**Department of Safety & Homeland Security**
**DIVISION OF GAMING ENFORCEMENT**
**600 S. Bay Road , Suite#2**
**Dover, Delaware 19901**

February 23, 2023

Laurence Escalante, CEO
VGW Luckyland, Inc.
c/o The Corporation Trust
1209 North Orange Street
Wilmington, DE 19801-1120

**RE:** **Cease and desist LUCKYLAND SLOTS Operations within the State of Delaware**

Dear Mr. Escalante:

The Delaware Division of Gaming Enforcement ("DDGE") has been made aware of your company's website "https://luckylandslots.com". DDGE is tasked with the enforcement of gambling related crimes pursuant to 28 *Del. C.* § 8236. A review of your online website (https://luckylandslots.com) shows that you are offering casino games where one may pay to play games of chance for an opportunity to win cash prizes. Further, in your "Eligibility to Play Luckyland Slots" disclosure you indicate that eligible participants are legal residents of the permitted territories which include the United States except for Idaho and Washington. Permitting those people who reside in Delaware to participate in these games is in violation of Delaware law.[1]

DDGE hereby demands that VGW Luckyland, Inc. take immediate action to ensure that persons physically located in the State of Delaware are not permitted to participate in pay to play games of chance for cash prizes. We further demand VGW Luckyland, Inc. immediately suspend all such accounts accessed by users physically located within the State of Delaware.

---

[1] *See* Del. Const. art II, § 17; 11 *Del. C.* §§ 501, 511, 531, 1402-1406, and 1411 (establishing the various crimes and theories of criminal liability relating to illegal gambling in the State of Delaware.)

We trust that VGW Luckyland, Inc. will act quickly to comply with the demands set forth herein and ensure that it acts reasonably to terminate any and all illegal operations occurring within the physical territory of the State of Delaware. Please confirm that VGW Luckyland, Inc. has taken action consistent with the demands set forth herein by written response no later than March 31, 2023.

Sincerely,

Gregory Nolt
Director
Delaware Division of Gaming Enforcement

cc:    Helene Keeley, Director, Delaware State Lottery
Lt. Thomas Paskevicius, Delaware State Police, Deputy Director DDGE
Stacey Bonvetti, Deputy State Solicitor, Delaware Department of Justice

**EXHIBIT 4**



# PROSPECTUS
## SYNERGY PLUS LIMITED
### TO BE RENAMED VGW GAMING LIMITED

ACN 091 126 062



Corporate Advisors:

indianocean

# Prospectus

For a public offer of up to 70,000,000 Shares (post-Consolidation) at an issue price of $0.05 per New Share to raise up to $3,500,000 (**Public Offer**).

**The Public Offer is scheduled to close at 5:00pm (WST) on 9 February 2016 unless extended or withdrawn. Applications must be received before that time to be valid.**

This Prospectus also contains:

— an offer of up to 932,183,398 Shares and 95,662,112 Options (post-Consolidation) to the VGW Holdings Vendors in consideration for the acquisition of all of the issued capital in VGW Holdings (**VGW Holdings Offer**). Refer to Section 2.1.2 of this Prospectus for further details of the VGW Holdings Offer;

— an offer of up to 19,000,000 Shares (post-Consolidation) to the Synergy Lenders in consideration for conversion and repayment of the SNR Lenders (**SNR Lender Offer**). Refer to Section 2.1.3 of this Prospectus for further details of the SNR Lender Offer;

— an offer of up to 20,000,000 Shares and 6,000,000 Options (post-Consolidation) to Minimum Risk in consideration for conversion and repayment of the Minimum Risk Loan (**Minimum Risk Offer**). Refer to Section 2.1.4 of this Prospectus for further details of the Minimum Risk Offer;

— an offer of up to 47,350,067 Employee Loan Shares and 96,926,780 Employee Incentive Options (post-Consolidation) to the VGW Holdings employee (**Employee Offer**). Refer to Section 2.1.5 of this Prospectus for further details of the Employee Offer;

— an offer of up to 9,000,000 Options (post-Consolidation) to the Company's incoming Executive Chairman, Mr Nigel Blythe-Tinker (**Chairman Offer**). Refer to Section 2.1.6 of this Prospectus for further details of the Chairman Offer;

— an offer of up to 650,000,000 Performance Shares (post-Consolidation) to Lance East Corporation (**Lance East Offer**). Refer to Section 2.1.7 of this Prospectus for further details of the Lance East Offer; and

— an offer of up to 72,500,000 New Options (post-Consolidation) to Minimum Risk (or its nominee) as part consideration for underwriting the Public Offer (**Underwriter Offer**). Refer to Section 2.1.8 of this Prospectus for further details of the Underwriter Offer.

(collectively, the **Transaction Offers**)

**The Transaction Offers are scheduled to close at 5:00pm (WST) on 9 February 2016 unless extended or withdrawn. Application must be received before that time to be valid.**

Completion of each of the Offers is conditional upon Shareholders approving, at the General Meeting to be held on 29 January 2016, various resolutions, including the change in nature and scale of activities, consolidation of capital and the issue of the Shares and Options offered by this Prospectus. Please refer to Section 2.2 of this Prospectus for further details.

**IMPORTANT INFORMATION**

This Prospectus is a re-compliance prospectus for the purposes of satisfying Chapters 1 and 2 of the ASX Listing Rules and to satisfy the ASX requirements for re-listing following a change to the nature and scale of the Company's activities.

All references to Securities in this Prospectus are made on the basis that the 50:1 Consolidation, unless otherwise stated, for which Shareholder approval is being sought at the General Meeting to be held on 29 January 2016, has taken effect.

This is an important document that should be read in its entirety.

If you do not understand it you should consult your professional advisers without delay. The Securities offered by this Prospectus should be considered highly speculative.

# Contents

Corporate Directory ................................................................................................ 5

Important Notice .................................................................................................... 6

Key Offer Information ............................................................................................. 8

Chairman's Letter .................................................................................................. 9

**1** Investment Overview ......................................................................................... 11

**2** Details of the Offers .......................................................................................... 47

**3** Company Overview Upon Completion of Acquisition ........................................ 57

**4** Independent Industry Report ............................................................................. 67

**5** Risk Factors ...................................................................................................... 103

**6** Financial Information ......................................................................................... 115

**7** Investigating Accountant's Report ..................................................................... 135

**8** Board, Management and Corporate Governance ............................................... 139

**9** Material Contracts .............................................................................................. 151

**10** Additional Information ...................................................................................... 161

**11** Directors' Authorisation .................................................................................. 179

**12** Glossary .......................................................................................................... 181

# 4    Independent Industry Report

# Premium business
# solutions



Gambling Capital

◉ h2gc.com

**AUSTRALIAN SECURITIES EXCHANGE (ASX) LISTING**

US Gaming Industry – Independent Market Report

January 2016

Prepared for: Virtual Gaming Worlds
Prepared by: H2 Gambling Capital

## EXECUTIVE SUMMARY

This report has been prepared by H2 Gambling Capital (H2) – the leading authority regarding market intelligence on the global gambling industry. It provides an independent assessment of the current US gaming market to sit within the prospectus documentation relating to the intended listing of Virtual Gaming Worlds (VGW) on the Australian Stock Exchange (ASX) during early 2016. As standard, H2 reports in EUR€ (as the most widely-used currency in the sector) and primarily utilises the 'gross win' metric to value the gambling sector.

The report's findings lead us to conclude that in all 3 segments of real money gaming, social casino and internet sweepstakes, the US market remains strong, with considerable further growth still to come over the next 5 years to the end of the decade. The following numbers in particular sum up the potential:

*Global vs US Gaming Market Growth 2014-2020 Overall Summary*

| | Global GGR | | | US | | |
|---|---|---|---|---|---|---|
| | 2014 (€bn) | 2020 (€bn) | CAGR | 2014 (€bn) | 2020 (€bn) | CAGR |
| Land-based Gaming | 332.0 | 357.0 | 1.2% | 104.8 | 117.1 | 1.9% |
| Real Money Online Gaming | 32.0 | 52.0 | 8.4% | 2.5 | 6.7 | 17.9% |
| Social Casino Gaming | 2.6 | 4.1 | 7.8% | 0.8 | 2.0 | 16.0% |
| Sweepstakes Gaming | N/A | N/A | N/A | 11.1 | 17.3 | 7.7% |

*Source: H2 Gambling Capital, 2015*



The following conclusions are drawn:

1    Global real money gaming growth is on a **steady upwards trajectory.**

2    **The US,** despite significant prohibition, remains **by far the largest gaming market in the world.**

3    Global gaming gross win reached **€364.0bn** in 2014 and will continue to grow at a **2.0% CAGR** from **2015 to 2020** to reach **€409.3bn** by the end of the decade.

4    The real money online gaming sector reached **€32.0bn** global gross win in 2014, growing at **8x the rate of its land-based equivalent** over the last 10 years, with no signs of this trend slowing down.

5    **750 million** people play social games worldwide, the majority **(24.5%)** aged over **46+ years.**

6    In the US, there are over **200 million players,** with 50% of social networking users and 34% of internet users playing social games.

7    '**Social casino'** is by far **the most popular form** of social gaming in the world.

8    Global social casino revenues were **€2.64bn** in 2014, and by 2019, will reach **€4.14bn GGR**, at a **CAGR of 7.8%.**

9    The US represents **the largest social casino market in the world**, with **€0.85bn** or **32%** of the global market in 2014.

10   Growth is expected to rise at a **CAGR of 16.0%,** so that by 2019, the US will have **over 50%** of the world's social casino market **(€2.07bn).**

11   '**Sweepstakes'** are a unique concept and not classed as gaming within the sector because they are **free to enter.**

12   If analysed against the potential value of the US real money online gaming if regulated, the actual market value for the sweepstakes gaming model could be as much as **$12.2bn** today, or **$82bn** over a 5-year period.

13   **Internet Sweepstakes Cafes** have evolved and proliferated across the US over the last 10 years, but are **equally as applicable** across many of the world's Top 30 gaming nations.

14   **Internet Sweepstakes Cafes** are reported to have turned over **$10bn (€9.4bn)** in 2015, with **over 5,000** now operating in **12 states.**

*H2 Copyright*
*No part of this report may be reproduced for any purpose whatsoever without prior permission from H2 Gambling Capital. H2 Gambling Capital owns the interactive gambling industry model that generates the industry values and forecasts referenced herein.*

## SECTION 3: US INTERNET SWEEPSTAKES GAMING

*'Sweepstakes' are a unique concept and not classed as gambling within the sector because they are free to enter.*

*If assessed against the potential value of the US real money online gaming if regulated, the actual market value for the sweepstakes model could be as much as $12.2bn today, or $82bn over a 5-year period.*

*Internet Sweepstakes Cafes provide a land-based example that has evolved and proliferated across the US over the last 10 years, but are equally as applicable across many of the world's Top 30 gaming nations.*

*Internet Sweepstakes Cafes are reported as turning over $10bn (€9.4bn) annually in 2015, with over 5,000 now operating in 12 states.*

## DEFINITION

65  'Sweepstakes' are a particular form of gaming in which all stakes in the game are offered at no charge to the participants, and its associated prizes are divided up amongst its winners. They are a unique concept within the sector as they are not classed legally as gambling or lotteries. They are instead considered a free to enter promotion in which a cash prize is awarded to its participants, even though this is won on the basis of chance, not skill.[6]

66  Sweepstakes are globally used as a form of trade promotion, but they have gained particular traction in the US recently, and are now considered a real market opportunity, as well as an innovative way of combining land-based and online gaming. Under US gambling law, if the sweepstakes participant can play a game for free (i.e. with no paid-in consideration), then it does not matter if the outcome is determined more by chance than skill, prizes can still be won. No-purchase-necessary sweepstakes have been common in the US since at least 1954, when the US Supreme Court ruled that the television game show *Name That Tune* was not a lottery, given contestants at home could enter by sending in a postcard. Sweepstakes do not involve 'consideration' because the player does not pay to enter, rather their entry is supplementary to a related purchase.

67  Over the last 10 years, 'Internet Sweepstakes Cafes' have evolved and proliferated across the US. They operate as internet cafes that offer their customers entrance into a sweepstakes draw upon the purchase of a product, often internet time or telephone call minutes. The participant can find out whether they have won the pre-determined draw by a simple reveal but many choose to do so through a programme that simulates a slot machine or poker game. This may even include an online element, but neither the presentation nor their interaction affects the outcome of the draw!

68  Increasingly sweepstakes gaming has emerged out of these cafes, with consumer products allowing 'free' entrance into games in which cash prizes can be won in return.

## MARKET SIZE – GLOBAL V US

69  There is far less reported data on Internet Sweepstakes Gaming (Internet Sweepstakes Gaming or ISG) than any other form of gaming.

70  Sweepstakes are an established form of trade promotion in many of the more developed international economies, and while the US market has demonstrated the highest rate of adoption of the internet sweepstakes cafe business model, it is equally applicable across the majority of the world's top 30 gaming nations (see Fig 6 earlier).

---

6    http://www.sweepstakeslaw.com/internet-sweepstakes.html

## US Potential Activity

71  There is a significant opportunity for Internet Sweepstakes Gaming in the United States market. The size of the market opportunity could be estimated based on the total size of the US online real money gaming market (particularly casino, poker and lottery) if it was fully regulated and licensed across the US, as this, in comparative terms, ultimately represents the market (estimated below in US$) within which the internet sweepstakes cafe model presently operates.

72  Only $2.82bn (or 2.4%) of all US real money gaming was online in 2014. Although this number positions the United States as the 4th largest online gaming market in the world, H2 is confident that it does not represent anywhere near the present potential for onshore regulated online gaming in the US at this time. This is because the 3 states currently legalised (Delaware, Nevada and New Jersey) have all operated under significant open market constraints -- including a lack of a critical mass of other states in the market (liquidity); limited acceptance of payment credit cards, and key restrictions on advertising (the lifeline of the online operator).

73  In considering both this and the 'potential' US activity nationwide, H2 believes it is conservative to focus on the 24 states in which land-based gaming is legal and regulated, namely: Nevada, South Dakota, Colorado, New Mexico, Kansas, Oklahoma, Iowa, Missouri, Illinois, Michigan, Indiana, Ohio, West Virginia, Louisiana, Mississippi, Florida, Pennsylvania, New York, Maryland, Delaware, New Jersey, Rhode Island, Massachusetts and Maine.

74  H2's has estimated the size of the market opportunity for Internet Sweepstakes Gaming in the US based on its estimate of the size of the online real money casino and poker gaming market, increasing to $9.3bn gross win within 1 year and reaching $14.4bn within 5 years, with a total of c$60bn over the first 5 years. For lottery, it would result in an additional $2.9bn within year 1, rising to $4.6bn by year 5, with a first 5 year total of c$22bn. H2 estimates a total US online real money gaming market size of $12.2bn today, $19.0bn in 2020 and a total amount of $82bn over the full five year period.

75  As it is difficult, to predict legislative movement at a US Federal level over the next 5 years, it is reasonable to develop a more realistic 'base case' estimate of the market size, somewhere in the realm of about half of the above estimates. H2 estimates this 'base case' could be achieved if just 8-10 key states, including the addition of the four states actively considering online regulation currently (i.e. California, Illinois, New York and Pennsylvania), which would get the estimation to c50% of the potential value. However this would be predicated on all 3 of the above issues being addressed, including the ability to pool liquidity and operate across states but be locally licensed (as is the case currently with US horse race betting).

## US Current Activity

76  In terms of current US market size, the American Gaming Association has estimated that there are presently 5,000 internet sweepstakes cafes operating in 12 states across the US.[7] Internet sweepstakes cafes are estimated to turnover $10bn (€9.4bn) annually in 2015[8].

---

[7]  ASA 'Internet sweepstakes cafes: unregulated storefront gambling in the neighborhood' - https://www.americangaming.org/research/white-papers/internet-sweepstakes-cafes and http://www.latimes.com/local/lanow/la-me-ln-sweepstakes-games-20150625-story.html

[8]  ASA 'Internet sweepstakes cafes: unregulated storefront gambling in the neighborhood' - https://www.americangaming.org/rese-arch/white-papers/internet-sweepstakes-cafes and http://www.latimes.com/local/lanow/la-me-ln-sweepstakes-games-20150625-story.html

**EXHIBIT 5**



Synergy Plus Limited
ACN 091 126 082
c/- RSM Bird Cameron
8 St. George Terrace
WA 6000 Australia

27 October 2015                                                                          **ASX ANNOUNCEMENT**

# SYNERGY PLUS LIMITED ENTERS AGREEMENT TO ACQUIRE VGW HOLDINGS LIMITED

## HIGHLIGHTS

- Synergy Plus Limited (**Synergy** or the **Company**) has entered into a conditional acquisition agreement with VGW Holdings Limited (**VGW**).

- VGW is an Australian technology and online gaming company that develops and operates international cash-prize contests through its innovative social casino products. It currently operates on the largest social network and leverages the world's leading payment provider platforms.

- VGW operates a sweepstakes social casino, targeting the global casino market, particularly the unrealised United States real-money gaming market.

- VGW had annualised revenue of over $13 million in September 2015, which was derived from paying players in the United States.

- VGW has been in operation for over 4 years and developed and commercialised through total private equity capital raisings of $14.6 million.

- VGW is positioned to take advantage of its large target markets, which are currently subject to low-levels of competition and have significant potential for growth.

- Synergy Plus Limited to raise $5 million, where existing shareholders will have a preference in taking-up the offer under the prospectus.

- VGW will use the proceeds of the capital raising to continue to grow in the United States international expansion, and the development of new products.

## SUMMARY

Synergy is pleased to announce that it has signed a conditional term sheet to acquire 100% of VGW, a technology and online gaming business (the **Transaction**).

VGW develops and operates proprietary technology in real-money gaming, enabling cash-prizes to be paid to international players, particularly those located in the United States, via its social casino games. It operates the sweepstakes social casino: Chumba Casino.

Synergy's acquisition of VGW will include the appointment of VGW founders and executive management to the Synergy board. Synergy proposes to undergo a capital consolidation as a part of the acquisition of VGW and a capital raising of $5 million under a prospectus. Preference of allocation under the prospectus will be given to Synergy shareholders.

VGW will use the proceeds of the capital raising to continue its United States growth, global expansion, and the development of new products.

 

## ABOUT VGW HOLDINGS LIMITED

VGW is a developer and operator of social casino games with sweepstakes cash prize gameplay, which provides for the payout of cash prize winnings from casino games. Sweepstakes gameplay entails a real-money, online prize gaming alternative for all 50 states of the United States, where online gambling is largely prohibited.

VGW derives a majority of revenues via its wholly owned platform: http://www.chumbacasino.com

VGW's primary marketing channel is via the Facebook social media platform, a globally dominant social and casual gaming platform, and its primary payment platform is Paypal, the world's largest payment provider platform.

VGW's strategy is to:

- continue to deploy sweepstakes gameplay technology in the United States and to expand the offering across other key gaming product lines, including: casino, lottery, poker and sports;

- expand into major Asian, European and Latin American gaming markets;

- pursue strategic acquisitions in the social games and gaming sectors, to accelerate growth  by integrating VGW's  Sweepstakes Gameplay technology with existing gaming businesses and audiences; and

- leverage the skills and expertise of an experienced and proven executive and leadership team.

The company has been in operation for over 4 years, developed and commercialised through total private equity capital raisings of $14.6 million, has over 8,000 paying customers and is currently operating at an annualised revenue run-rate of over $13 million.

VGW will undertake a scheme of arrangement to implement the Transaction with Synergy.

## THE TRANSACTION

The key terms of the Transaction are as follows:

1. Initial capital raising by Synergy of $300,000 through the placement of Shares with a free attaching option for each new share (**Placement Shares**);

2. Synergy will conduct a 50:1 consolidation of its existing issued capital.  This will reduce the issued capital of Synergy to approximately 14,808,157 fully paid ordinary shares (**Shares**);

3. Subject to receiving the consent of third party lenders and creditors, Synergy will issue up to 17,000,000 Shares (post consolidation) at a deemed issue price of $0.05 per Share to payout, or in consideration for the conversion of previously advanced loans and creditors totaling approximately $850,000 (**Conversion Shares**);

4. The issue of 14,000,000 Shares (post consolidation) to Minimum Risk Pty Ltd in consideration for the off-set of outstanding loans made by Minimum Risk Pty Ltd to various subsidiaries of Synergy (**Minimum Risk Shares**).  In addition, Minimum Risk will take control of Synergy's 60% owned subsidiary, Airdata Pty Ltd.  Minimum Risk Pty Ltd is a company associated with and controlled by Mr Christopher Martino, a director of Synergy;

  

5.  Synergy will acquire VGW via the issue of up to 933,346,204[1] Shares (post-consolidation) at a deemed issue price of $0.05 per Share, 650,000,000 Performance Shares (refer to paragraph 6 below) and 65,662,112 options (exercisable at $0.05 and with an expiry date of 14 August 2017) (**Acquisition Securities**) and agreeing to issuing 9,000,000 options (exercisable at $0.05 and with an expiry date of 15 May 2017) to VGW's Executive Chairman, Mr Nigel Blythe-Tinker.  Subject to any necessary approvals that may be required, it is anticipated that the Acquisition Securities will be distributed under schemes of arrangement with existing VGW securityholders.  Pursuant to ASX Listing Rules, the Acquisition Securities may attract escrow provisions;

6.  Synergy will issue Performance Shares as follows to Lance East Corporation, the founding shareholder of VGW controlled by Mr Laurence Escalante:

| Milestone | No. of Performance Shares (Post Consolidation) | Performance Period |
|---|---|---|
| A$10 million annual audited revenues in VGW | 120,000,000 | 5 years |
| A$20 million annual audited revenues in VGW | 120,000,000 | 5 years |
| A$30 million annual audited revenues in VGW | 120,000,000 | 5 years |
| A$40 million annual audited revenues in VGW | 120,000,000 | 5 years |
| A$50 million annual audited revenues in VGW | 120,000,000 | 5 years |
| A$100 million annual audited revenues in VGW | 50,000,000 | 5 years |

Each Performance Share will convert into one ordinary Share if the relevant Milestone is met within the Performance Period

7.  Synergy will assume VGW's Convertible Note liabilities totaling $400,000, and comprising: (a) three convertible notes with a total face value of $250,000 convertible (at the noteholder's discretion) to 12,500,000 shares (post-consolidation) at 2 cents per share; and (b) one convertible note with a face value of $150,000 convertible (at the noteholder's discretion) to up to 2,000,000 shares (post-consolidation), with the final number of shares being dependent upon the value of VGW at time of conversion, unless otherwise converted to equity prior to completion of the Transaction.

8.  Synergy will seek to issue 100,000,000 Shares (post-consolidation) at an issue price of $0.05 per Share to raise not less than $5,000,000 under a prospectus (**Capital Raising Shares**). The capital raising has been underwritten by Minimum Risk Pty Ltd, a related party and is subject to shareholder approval.

---

[1] This number includes 10,833,333 VGW shares still to be issued (unless it is agreed that these shares are otherwise issued on completion of the Transaction).  2,333,333 shares are to be issued to three overseas based VGW contractors in quarterly installments to June 2016 as payment for services; and 8,500,000 shares to be issued to three VGW employees in quarterly installments to June 2016 through non-recourse loan arrangements.  The loan is repayable





On completion of the Transaction, Synergy proposed to change its name to "VGW Gaming Limited". Additionally, the current Board of Synergy will be replaced with Messrs Nigel Blythe-Tinker (Executive Chairman), Laurence Escalante (Chief Executive Officer) and a third director at VGW's discretion (Non-executive Director). Messrs Domenic Martino, Philip Silva and Christopher Martino will resign from the board.

## CONDITIONS PRECEDENT

Completion of the acquisition of VGW is subject to and conditional upon satisfaction of the following conditions by the dates indicated below (or such other dates as agreed between the parties):

1.    Completion of due diligence investigations by Synergy by 15 November 2015;

2.    Receipt of consents from lenders and creditors of Synergy to effect the proposed loan restructurings by 30 November 2015;

3.    Receipt from ASX of conditional re-listing approval on ASX by 30 November 2015;

4.    Receipt of shareholder approval in relation to the underwriting agreement with Minimum Risk Pty Ltd with respect to the Capital Raising Shares before 31 January 2016; and

5.    The parties obtaining all relevant approvals, including shareholder approval, court approval, board approval and any third party consents necessary to implement the Transaction by 31 January 2016.

## PUBLIC OFFERING AND RE-ADMISSION

Synergy will prepare a prospectus to issue the Capital Raising Shares which will give preference to existing shareholders as well as enable third party investors to participate in the public offering. Synergy will then seek to apply for re-admission to the official list of ASX (**Official List**). Whilst the Board is confident that Synergy will satisfy the ASX Listing Rule requirements for re-admission by completing the Transaction, there is no guarantee that ASX will permit Synergy to be re-admitted to the Official List.

## SHAREHOLDER BENEFITS

Completion of the Transaction will restructure the Company's issued capital and net asset base, providing working capital, a new board and business direction.

Whilst the current board of Synergy is aware that the Transaction will result in a significant dilution of existing shareholders, the board is of the view that this proposal is the best outcome for shareholders in the current circumstances.

## SHAREHOLDER MEETING

To implement the Transaction, Synergy will prepare a notice of meeting seeking shareholder approval for, among other things, the acquisition of VGW.

Shareholders will receive a notice of meeting setting out various resolutions and further information relating to the proposed Transaction (**Notice of Meeting**). A detailed explanatory statement will accompany the Notice of Meeting and will be distributed to all shareholders prior to the Meeting.





## INDICATIVE CAPITAL STRUCTURE

The table below details the Company's current capital structure and its proposed indicative capital structure after the completion of the Transaction:

| Securities | Current | Post-Acquisition |
|---|---|---|
| Shares | 740,407,849 | 1,085,154,361 |
| Options | - | 175,662,112 |
| Performance Shares | - | 650,000,000 |

## UNDERWRITING

Subject to shareholder and regulatory approvals, Minimum Risk Pty Ltd (an entity associated with Mr Christopher Martino) has agreed to underwrite the Company's proposed $5 million capital raising.

A summary of the terms of the Underwriting Agreement is as follows:

- Minimum Risk Pty Ltd fully underwrites the Capital Raising Shares;

- Minimum Risk Pty Ltd may procure sub-underwriters;

- The underwriting fee comprises:

  o an underwriting fee equal to 6% of $5,000,000 (being the amount sought to be raised under the Capital Raising); and

  o the issue of 47,500,000 options (post-consolidation) (exercisable at $0.05 and with an expiry date of 3 years from the date of issue) and 47,500,000 options (post-consolidation) (exercisable at $0.06 and with an expiry date of 3 years from the date of issue). No payment is to be made by Minimum Risk Pty Ltd for the issue of those options.

- Minimum Risk Pty Ltd is to subscribe for any shortfall within 5 business days after it receives the shortfall notice from the Company;

- Various events (such as breach of any representations given by the Company under the Underwriting Agreement, the commencement of litigation against the Company after the date of the Underwriting Agreement, the level of the ASX 300 Index declining by an aggregate amount of 20% in the 20 business days preceding the offer or there is an outbreak of hostilities involving any of Australia, Japan, the United Kingdom, the USA, the People's Republic of China), enable Minimum Risk Pty Ltd to terminate the Underwriting Agreement where the event is likely to have a material adverse effect on the financial position of the Company;

- The obligations of the underwriting only arise if the Company's shareholders approve the terms of the agreement, the prospectus is lodged with ASIC in accordance with an agreed timetable and the underwriter has approved the prospectus (which approval must not be unreasonably withheld).





## INDICATIVE TIMETABLE

The timetable for the acquisition of VGW and the re-listing of the Company on ASX will be advised to shareholders as soon as it is available. Consideration is being given to the requirements of VGW's scheme of arrangement and the December 2015 holiday period.

The board of Synergy will continue to provide shareholders with updates regarding the Transaction.

For and on behalf of the Board

**Leanne Ralph**
Company Secretary

For more information, please contact:

**Synergy Plus Limited**

Leanne Ralph
Company Secretary
+61 2 8263 0515

**VGW Holdings Limited**

Laurence Escalante
Founder & CEO
E: laurence@vgw.co

Nigel Blythe-Tinker
Non-executive Chairman
E: nigel@vgw.co

Rointon Nugara
CFO & Company Secretary
E: rointon.nugara@vgw.co

Tel: +2 8599 2507